# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE MARTHA STEWART LIVING | : | **Consolidated** |
| OMNIMEDIA, INC. STOCKHOLDER | : | **C.A. No. 11202-VCS** |
| LITIGATION | : | |

# OPINION

Date Submitted: July 24, 2017
Date Decided: August 18, 2017

Seth D. Rigrodsky, Esquire, Brian D. Long, Esquire, Gina M. Serra, Esquire, and Jeremy J. Riley, Esquire of Rigrodsky & Long, P.A., Wilmington, Delaware; Carmella P. Keener, Esquire of Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; James S. Notis, Esquire and Meagan Farmer, Esquire of Gardy & Notis, LLP, New York, New York; Evan J. Smith, Esquire and Marc L. Ackerman, Esquire of Brodsky & Smith, LLC, Bala Cynwyd, Pennsylvania; and Gustavo F. Bruckner, Esquire of Pomerantz LLP, New York, New York, Attorneys for Plaintiffs.

Kevin R. Shannon, Esquire, Matthew F. Davis, Esquire, and Mathew A. Golden, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Paul K. Rowe, Esquire of Wachtell, Lipton, Rosen & Katz, New York, New York, Attorneys for Defendant Martha Stewart.

John L. Reed, Esquire, Ethan H. Townsend, Esquire, and Harrison S. Carpenter, Esquire of DLA Piper LLP (US), Wilmington, Delaware and Mitchell A. Karlan, Esquire and Lauren Sager, Esquire of Gibson Dunn & Crutcher LLP, New York, New York, Attorneys for Defendants Sequential Brands Group, Inc., Singer Madeline Holdings, Inc., Madeline Merger Sub, Inc., and Singer Merger Sub.

**SLIGHTS, Vice Chancellor**

Beyond the broad enabling provisions of the Delaware General Corporation Law, there is no official guidebook or manual to which fiduciaries of Delaware companies may turn when determining how best to fulfill their duties to shareholders once a decision has been made to sell the company. Even so, Delaware courts have addressed certain recurring transactional scenarios with sufficient regularity and consistency that, over time, our decisional law has drawn situational "road maps" that guide directors, officers and others involved in the sales process through these scenarios in a manner that will allow them to earn the maximum deference for their decision making that our law allows under the circumstances.[1]

The proper means by which to manage the conflicts inherent in transactions involving controlling stockholders in various contexts has been the subject of several decisions of this court and our Supreme Court. Of particular relevance here, in the seminal *Kahn v. M&F Worldwide Corp.*,[2] our Supreme Court synthesized decades of jurisprudence to lay out the road map by which a controlling stockholder's buyout of its subsidiary in a negotiated merger will earn the controller the maximum deference our law allows, even at the pleadings-stage. Specifically, the court

---

[1] *See* William B. Chandler, III, *The Delaware Court of Chancery and Public Trust*, 6 Univ. of St. Thomas L.J. 421, 423–24 (2009) (noting that "one can, over time, weave [the decisions of the Court of Chancery] together to form a road map, an acceptable path for directors and officers of companies, so they can know what is expected of them.").

[2] 88 A.3d 635 (Del. 2014).

explained that if the relevant constituencies involved in the transaction precisely implement designated measures intended to replicate arms-length bargaining, then the standard by which the alleged conflicted transaction will be reviewed, even at the pleadings stage, will be the business judgment rule. If they deviate from the detailed road map laid out by the court, however, then the path to pleadings-stage deference will be closed and the default standard of review, entire fairness, will govern any motion to dismiss the complaint.[3]

In this consolidated class action, former stockholders of Martha Stewart Living Omnimedia, Inc. ("MSLO" or the "Company") have brought claims in a Verified Second Amended Class Action Complaint (the "Complaint") against the Company's former controlling stockholder and namesake, Martha Stewart, for breach of fiduciary duty and against the third-party buyer, Sequential Brands Group, Inc. ("Sequential"), for aiding and abetting that breach. The claims arise out of a transaction that closed in December 2015, whereby MSLO was acquired by Sequential in a merger (the "Merger"). Pursuant to the Merger, MSLO stockholders

---

[3] *Id.* at 645 (holding that "the business judgment standard of review will be applied [in controller buyouts] *if and only if*" the prescribed steps—*ab initio* creation of a well-functioning special committee comprised of independent directors and *ab initio* conditioning the consummation of the transaction on the informed, uncoerced approval of a majority of the minority stockholders—are taken as outlined) (emphasis in original).

could elect to receive $6.15 per share either in cash or common stock of the newly formed company based on a conversion formula set forth in the merger agreement.

The gravamen of the claim against Stewart is that she leveraged her position as controller to secure greater consideration for herself than was paid to the other stockholders. In a motion to dismiss the Complaint, Stewart denies that she was paid disparate consideration but argues that even if the Complaint pleads that she engaged in a conflicted transaction, the Court should review the allegations under the business judgment rule standard since the transaction was structured in a manner that provided meaningful protections to the minority stockholders.

This court has not yet had occasion to address whether the transactional structure outlined in *M&F Worldwide* fits when the controller is a seller only and, if so, whether strict compliance with the prescribed steps is necessary to secure pleadings-stage business judgment rule review. For reasons I explain below, I have determined that *M&F Worldwide* does apply to conflicted one-side controller transactions. I have also determined that business judgment deference is appropriate at the pleadings stage in this case because the dual procedural protective measures deployed in connection with this transaction—the creation of an independent special committee and the adoption of a majority of the minority approval condition— followed the *M&F Worldwide* road map with precision and were in place at the moment Stewart began to negotiate for consideration over and above what would be

3

paid to the other stockholders. Because the course of this transaction hit each point on the *M&F Worldwide* map, Plaintiffs' only path to challenge the Merger is via a claim of waste, which they have neither pled nor remotely suggested is viable here.

As explained below, I have also concluded that the Complaint does not adequately plead that Stewart, as controlling stockholder, engaged in a conflicted transaction in any event. The timeline of the negotiations surrounding the Merger and the "side deals" Sequential entered into with Stewart reveals that Plaintiffs will be unable, under any reasonably conceivable circumstance, to prove a central element of their claim, causally related damages. Contrary to the story chronicled in the Complaint, where Stewart allegedly diverted consideration from MSLO stockholders to herself, and thereby caused Sequential to lower its offer for the Company, the actual series of events described in the publicly filed documents on which the Complaint relies confirms that the consideration Sequential offered to MSLO stockholders actually increased after negotiations with Stewart began. Under these circumstances, it is not reasonably conceivable that Plaintiffs can prove their claim that Stewart engaged in a conflicted transaction through which she caused injury to the minority stockholders by diverting merger consideration to herself.

Plaintiffs have also failed to allege sufficient non-conclusory facts that would allow any inference that the side deals Sequential negotiated with Stewart to ensure her continued commitment to the acquired company were materially different from

4

or more lucrative to Stewart than the contractual arrangements Stewart already had in place with MSLO. Having failed to plead a conflict between Stewart and the minority stockholders, the appropriate standard of review is the business judgment rule even if the transactional structure strayed from the *M&F Worldwide* road map.

For its part, Sequential seeks dismissal of the aiding and abetting claim on two grounds: (1) the claim fails as a matter of law because the Complaint does not plead a viable claim for breach of fiduciary duty against Stewart; and (2) the Complaint fails to plead one of the required elements of an aiding and abetting claim, knowing participation in the breach by Sequential. Because I have determined that the Complaint fails to state a claim for breach of fiduciary duty against Stewart, I dismiss the Complaint against Sequential on that basis and need not reach the question of whether the Complaint adequately pleads the other elements of aiding and abetting a breach of fiduciary duty.

## I. BACKGROUND

I have drawn the facts from the allegations in the Complaint, documents integral to the Complaint and matters of which I may take judicial notice.[4] I have

---

[4] *In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *8 (Del. Ch. Oct. 24, 2014) ("'A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents.' Under at least the first exception, [the court finds] that consideration of the Proxy Statement is appropriate in resolving this dispute.") (citation omitted); *In re Gardner Denver, Inc.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014) (on a motion to dismiss, the Court may rely on

5

assumed that all well-pled facts in the Complaint are true, except in those instances where the Plaintiffs fail adequately to explain contradictions between the facts as pled in the Complaint and the facts as recited in the Proxy on which the Complaint relies to describe the background of the Merger. In the face of outright contradictions between the Complaint and the Proxy, I have considered the Proxy for its truth, even at this procedural stage, because it is integral to Plaintiffs' claims.[5]

documents extraneous to a complaint "when the document, or a portion thereof, is an adjudicative fact subject to judicial notice.") (internal citation and quotation marks omitted); *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *5 (Del. Ch. Dec. 22, 2010) (same).

[5] *See Orman v. Cullman*, 794 A.2d 5, 16 (Del. Ch. 2002) (explaining that the Proxy Statement could be considered for its truth because "it is [] integral to [Plaintiff's] complaint as it is the source for the merger-related facts as pled in the complaint. Therefore, the Proxy Statement, and any other documents incorporated into it, are incorporated by reference into the complaint and will be considered on this motion."). In this case, the exception that allows the court to consider a document outside the pleadings for its truth on a motion to dismiss takes on a heightened level of importance because there are starkly conflicting factual narratives in the Complaint and in the Proxy. Indeed, given the import and potentially case dispositive nature of this issue, I requested that the parties submit supplemental briefing on the extent to which the Court could rely upon factual statements in the Proxy. In their supplemental briefing, Plaintiffs cite to *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59 (Del. 1995) for the proposition that the Court cannot deem the contents of the Proxy as true. *Sante Fe* said no such thing. To be sure, our Supreme Court did emphasize that public filings, like a Proxy, should only be used to establish what was told to stockholders in public disclosures or to establish "formal, uncontested matters." *Id.* at 70. The Supreme Court made clear, however, that these limitations applied "[w]hen a proxy statement is merely appended to the complaint and relied upon for the disclosure claims, but is not put forth by plaintiffs as an admission of the truth of the facts referred to therein. . ." *Id.* In this case, Plaintiffs did much more than "merely append" the Proxy to their Complaint; they referred to it as the source of their merger-related facts on which their claims rest. In doing so, they can fairly be said to have made "an admission of the truth of the facts referred to therein." *Id.* Thus, contrary to Plaintiffs' argument, *Santa Fe* is consistent with the conclusion in *Orman* that when a public filing is "integral to [a Plaintiff's] complaint [because] it is the source for the merger-related facts as pled in the

## A. The Parties and Relevant Non-Parties

Lead plaintiffs, Paul Dranove, Phuc Nguyen, Kenneth Steiner, and Richard Schiffrin, were at all relevant times the owners of Class A common stock of MSLO.

Defendant, Martha Stewart, is the founder and namesake of MSLO. She was indisputably MSLO's controlling stockholder at the time of the Merger.

Defendant, Sequential, is a Delaware corporation headquartered in New York City. Its business consists of owning, promoting, marketing and licensing a portfolio of consumer brands in the fashion, active and lifestyle categories. Defendant, Singer Madeline Holdings, Inc. ("TopCo"), is a Delaware corporation formed to effectuate the Merger. Defendants, Madeline Merger Sub, Inc. and Singer Merger Sub, were Delaware corporations and wholly-owned subsidiaries of TopCo that facilitated the Merger and ceased to exist thereafter (collectively, the "Sequential Defendants").

Pierre deVilleméjane, a director of MSLO since August 2013, was the Chairman of a special committee formed in 2014 to consider possible strategic transactions on behalf of MSLO that ultimately negotiated the transaction with Sequential (the "Special Committee").[6] He is also the CEO of WWRD Holdings

---

complaint," it should be "incorporated by reference into the complaint and []considered on this motion." *Orman*, 794 A.2d at 16.

[6] Plaintiffs initially brought claims against the members of the Special Committee for breach of fiduciary duty, but voluntarily dropped those claims when they filed the operative consolidated complaint. (DI 30).

Limited ("WWRD"), a position he has held since March 2009. WWRD offers products under various brand names, including Wedgwood and Waterford. Wedgwood has a line of products designed by Stewart, sold under the name "Martha Stewart Collection by Wedgwood."[7] Wedgwood and Waterford Products are also promoted on MSLO's website.

William Roskin, a director of MSLO since October 2008 and member of the Special Committee, was previously employed at Viacom until 2008. Viacom and its affiliate carried the *Martha Stewart Living* syndicated television program until 2004.

Arlen Kantarian, a director of MSLO since February 2009 and a member of the Special Committee, previously served as CEO of Professional Tennis for the United States Tennis Association and US Open from 2000 to 2008. It is alleged that Stewart is "a self-avowed tennis enthusiast who has three tennis courts on her various properties [and] who [has] attended the tennis matches and the GalaOpen for the [USTA-sponsored] US Open."[8]

Margaret M. Smyth, a director of MSLO since January 2012 and a member of the Special Committee until November 13, 2014, was previously a partner at

[7] Compl. ¶ 31(c).

[8] Compl. ¶ 31(b).

Arthur Andersen.  It is alleged that MSLO was one of Smyth's "accounts" at Arthur Andersen.[9]

## B. The Company

Founded in 1996, MSLO was a Delaware corporation headquartered in New York City that conducted a media and merchandising business, creating original how-to content and related products for homemakers and other consumers.  MSLO organized its business into three segments: Publishing, Merchandising, and Broadcasting.  Its common stock was publicly traded on the NYSE under the ticker symbol "MSO."

Prior to the Merger, MSLO had two classes of common stock: Class A (one vote per share) and Class B (ten votes per share).  As of September 18, 2015, MSLO had 32,510,392 shares of Class A common stock outstanding and 24,984,625 shares of Class B common stock outstanding.  Stewart owned or controlled 100% of the Class B shares and 2,102,946 Class A shares, which collectively represented 88.8% of the total voting control of MSLO.  She shared voting power with her daughter, Alexis Stewart, on behalf of the Martha Stewart Family Limited Partnership (the "Trust") up to the time of the Merger.  The Class B shares were transferrable only among the triangle of Stewart, the Trust, and Alexis Stewart.  In

---

[9] Compl. ¶ 31(e).

the event of a transfer of Class B shares outside the triangle, the transferred shares would automatically convert into Class A shares.

## C. Stewart's Pre-Merger Contractual Relationships with MSLO

Prior to the Merger, MSLO maintained three key agreements with Stewart or her affiliates: (1) an employment agreement (the "MSLO Employment Agreement"); (2) an Intellectual Property License and Preservation Agreement (the "IP Agreement"); and (3) an intangible asset license agreement with Lifestyle Research Center, LLC ("LRC"), another Stewart-owned entity (the "License Agreement"). Each are relevant to Plaintiffs' claims here.

Pursuant to the MSLO Employment Agreement, Stewart agreed to serve as MSLO's Chief Creative Officer and primary spokesperson, as the Founding Editorial Director for MSLO's publications and as the executive producer for MSLO's television and radio productions. MSLO, in turn, agreed to pay Stewart annual base compensation of $1.8 million with a right to receive up to $1.5 million per year in bonus compensation and reimbursement for performance expenses of up to $100,000 per year.

Pursuant to the IP Agreement, Stewart granted MSLO "an exclusive, worldwide, perpetual royalty-free license to use her name, likeness, image, voice,

and signature for products and services."[10] Under the IP Agreement, MSLO was the owner of the primary trademarks in the business and was granted the right to develop and register further trademarks incorporating the Martha Stewart name, even if Stewart ceased to be MSLO's controlling stockholder. If Stewart was terminated without "cause"—or if Stewart terminated her employment for "good reason"—the IP License would continue only in part, and Stewart would be permitted to use her name in new businesses.

Pursuant to the License Agreement, MSLO paid Stewart, through LRC, an annual fee for the perpetual, exclusive right to use certain Stewart-related intangible assets and to access various Stewart-owned realty through 2017. The annual fee initially was $2 million, but was reduced to $1.7 million in 2013 for an extended term lasting until September 15, 2017. If MSLO terminated Stewart for reasons other than for "cause," or if Stewart terminated her employment for "good reason," MSLO would be obligated to pay LRC the licensing fee through the License Agreement's remaining term. Otherwise, the License Agreement would terminate when Stewart's employment with MSLO terminated.

---

[10] Compl. ¶ 30.

**D. MSLO Explores a Potential Strategic Transaction With "Company A"**

In the summer of 2014, one of MSLO's peer companies ("Company A") advised Stewart that it wished to explore a potential strategic transaction with MSLO. Stewart subsequently informed MSLO's Board of Directors (the "Board") of Company A's expression of interest. At the time, MSLO's Board was comprised of six members: Stewart, Daniel W. Dienst, MSLO's CEO and a director of MSLO since October 2013, Arlen Kantarian, Pierre deVilleméjane, William Roskin, and Margaret M. Smyth.

After Stewart informed MSLO's Board of Company A's interest, Stewart, Dienst and other members of MSLO management engaged in "a number" of conversations with Company A representatives to explore Company A's overture.[11] On July 29, 2014, MSLO entered into a confidentiality agreement with Company A to facilitate more substantive discussions.

On August 26, 2014, MSLO's Board met at the offices of Debevoise & Plimpton LLP, MSLO's outside counsel. At that meeting, Stewart advised the Board that discussions with Company A were at a preliminary stage and that no valuation discussions or due diligence had occurred. The Board, in turn, determined that it

---

[11] Verified Second Am. Class Action Compl. ("Compl.") ¶ 34 (quoting Martha Stewart Living Omnimedia, Inc., Definitive Proxy Statement Form DEFM14A dated Oct. 27, 2015 ("Proxy") at 52).

was appropriate to form the Special Committee, comprised of independent directors, to evaluate and determine the advisability of the potential transaction with Company A and other alternatives "given Stewart's control position and the uncertainty regarding what her arrangements would be in connection with a potential transaction."[12] The Special Committee was comprised of deVilleméjane, Kantarian, Roskin, and Smyth.[13] The MSLO Board authorized the Special Committee at the outset of its formation to retain legal and financial advisors. The Board also delegated "full and exclusive" authority to the Special Committee to explore, evaluate and negotiate a potential transaction with Company A, to consider an alternative transaction or to decide not to pursue strategic alternatives should it determine that doing nothing was in the Company's best interest.[14]

---

[12] Compl. ¶ 35 (quoting Proxy at 53).

[13] deVilleméjane eventually became the Chairman of the Special Committee. Compl. ¶ 36. "Smyth resigned from the Committee on November 13, 2014 'due to professional obligations.'" *Id.* (quoting Proxy at 53).

[14] Compl. ¶ 38 (quoting Proxy at 53). Plaintiffs allege that the Special Committee's broad mandate was not in place until some time after the Board authorized the Special Committee to hire legal and financial advisors, noting that the Proxy states the Board "*subsequently* delegated full and exclusive authority" to the Committee to consider alternatives. *Id.* A fair reading of the Proxy, however, is that the Board both authorized the Special Committee to hire advisors and empowered the Special Committee to consider alternatives at the August 26 meeting. Proxy at 53 ("The MSLO Board of Directors authorized and empowered the Special Committee to retain independent legal counsel and financial advisors. The MSLO Board of Directors subsequently delegated to the Special Committee full and exclusive authority" to negotiate a transaction with Company A or any alternative transaction.). While this might suggest that the Board did not fix the Special Committee's mandate until some later date, the Proxy goes on to explain that, on the same date,

The Special Committee retained Debevoise as its legal advisor and Moelis & Company as its financial advisor.[15] With its advisers in place, the Special Committee began discussions with Company A regarding a potential transaction. It soon became clear, however, that "Company A was unwilling to expend the time and resources necessary to negotiate a transaction without first ascertaining whether it would be able to reach an understanding in principle with . . . Stewart . . . ."[16] To address this concern, "Company A requested the opportunity to negotiate certain post-closing employment arrangements with Stewart before negotiating the terms of a proposed acquisition."[17] The Special Committee granted Company A's request but "reserv[ed] [the] right to evaluate such arrangements."[18]

---

"immediately following the MSLO Board of Directors meeting at which the MSLO Board of Directors established the Special Committee, the Special Committee held a meeting to discuss its mandate and consider the retention of legal counsel and an independent financial advisor to the Special Committee." Proxy at 53. The Proxy further states that "[t]he MSLO Board of Directors resolved not to recommend any potential transaction or any other strategic alternative without the prior favorable recommendation of the Special Committee." Proxy at 53. With all of this said, what ultimately is relevant here is that Plaintiffs do not allege that the Special Committee did not have an appropriate mandate prior to beginning discussions with Sequential nearly three months after the Special Committee was formed.

[15] The Complaint points out that Debevoise had previously represented the Company and "had a prior relationship with Stewart and senior management." Compl. ¶ 39.

[16] Compl. ¶ 42 (quoting Proxy at 55).

[17] Compl. ¶ 42 (quoting Proxy at 55).

[18] Proxy at 55.

14

**E. Sequential Enters the Picture**

On November 12, 2014, while the Special Committee's negotiations with Company A were ongoing, Dienst had a lunch meeting with Bill Sweedler, the chairman of Sequential's board of directors and the co-founder and managing partner of Tengram Capital Partners ("TCP"), Sequential's largest stockholder. At that meeting, Sweedler indicated to Dienst that TCP was interested in exploring a transaction with MSLO. Later that month, TCP delivered a written preliminary indication of interest to Stewart, who then provided that document to the Special Committee.

TCP's indication of interest described two alternatives. The first was a recapitalization whereby TCP would acquire an unspecified number of shares from Stewart. In return, Stewart would receive the bargained-for consideration for her shares, compensation for the termination of her existing employment arrangements with MSLO and certain profit sharing interests in the shares of MSLO stock acquired by TCP. The second alternative was a merger with Sequential whereby Sequential would offer a combination of cash and stock for 100% of MSLO stock at a price of $4.50 per share (the stock's then-current trading price). After discussing "certain

15

financial considerations" raised by TCP's proposal, the Special Committee elected not to engage with TCP or Sequential at that time.[19]

On March 5, 2015, MSLO announced better-than-expected 2014 financial results and, over the next two weeks, the trading price of MSLO Class A common stock rose from $4.73 per share to $6.45 per share. Prior to March 5, 2015, Company A and Stewart had reached an agreement on Stewart's personal arrangements in the event a MSLO-Company A transaction was ultimately approved. Negotiations had reached a point where MSLO and Company A entered into an exclusivity agreement that would expire on April 3, 2015. Ultimately, however, the Special Committee rejected Company A's best proposal, which had increased to $4.90 per share and had been formulated before the announcement of MSLO's improved financial results. MSLO allowed the exclusivity agreement with Company A to expire as scheduled on April 3, 2015.

On April 9, 2015, the Special Committee and its advisors discussed "next steps" following the cessation of discussions with Company A. The following week, at a meeting on April 15, the Board received reports from the Special Committee and Moelis. The Special Committee advised the Board that discussions with Company A had ceased and Moelis then provided the Board with an overview of

---

[19] Proxy at 56.

alternatives that MSLO could pursue. As it considered next steps, the Board "considered the views of Stewart, who had expressed a preference for a targeted search for a potential buyer rather than a broad public auction."[20] When the Board discussed whether to resume contact with Sequential, Dienst informed the Board that he had a meeting scheduled the next day with Sweedler, Sequential's chairman, and that he would inquire whether Sequential was still interested.

Dienst met with Sweedler as scheduled. At the conclusion of the meeting, Sweedler confirmed that Sequential was prepared to submit a revised indication of interest to the Special Committee. On April 21, Sequential proposed a transaction at $6.20 per share, payable 50% in cash and 50% in stock. Two days later, MSLO entered into a confidentiality agreement with Sequential. Stewart and other members of MSLO management met with Sequential a week later to discuss "the potential merits of a combination transaction."[21]

## F. The Sequencing of Negotiations Related to the Merger

At the April 29 meeting of the Special Committee, Debevoise reported on its conversations with Stewart's counsel regarding a potential MSLO-Sequential transaction and the sequencing of negotiations surrounding Stewart's post-closing

---

[20] Compl. ¶ 47 (quoting Proxy at 58).

[21] Proxy at 59.

arrangements. Stewart's advisors represented that "Sequential was willing to base Stewart's post-closing arrangements on the terms of her existing arrangements with MSLO[.]"[22] The Special Committee determined that its negotiations with Sequential for a sale of MSLO should precede Stewart's negotiations with Sequential regarding her post-closing contractual arrangements and resolved to go forward with negotiations on that basis.

On May 11, Sequential submitted a revised proposal to acquire MSLO. The revised proposal set forth two prices for MSLO's stock that depended upon MSLO's success in renegotiating a publishing arrangement with its publishing partner, Meredith Corporation. If MSLO could renegotiate the Meredith contract on favorable terms, Sequential would increase its offer to $6.25 per share. If not, the offer would be $5.75 per share ($0.45 per share lower than the April 21 proposal).[23] This revised proposal was conditioned on approval by a majority of shares of MSLO common stock other than shares owned by Stewart and her affiliates.[24]

The Special Committee met next on May 12, 2015. At that meeting, Debevoise advised the Special Committee that Sequential was seeking to negotiate Stewart's post-closing arrangements and the terms of a MSLO-Sequential

---

[22] Compl. ¶ 51 (quoting Proxy at 59).

[23] Proxy at 60.

[24] *Id.*

transaction simultaneously. Just as Company A had insisted during its negotiations with the Special Committee, Sequential did not want to commit substantial resources to merger negotiations without at least simultaneously determining whether they could reach agreements with Stewart—the face of the Company—regarding her post-closing commitments to the acquired entity. And, just as it had approached negotiations with Company A, the Special Committee authorized Stewart to negotiate her post-closing arrangements at the same time the Special Committee negotiated the merger terms with Sequential, subject to the Special Committee's right to review those arrangements before determining whether to recommend the transaction to the full Board. During a Special Committee meeting a week later, the Special Committee decided that its negotiations of merger consideration with Sequential should culminate "near or at the time" all parties were ready to execute definitive agreements.[25]

## G. Sequential Submits a Revised Proposal

On June 5, 2015, Sequential submitted a revised proposal for the Special Committee's consideration. The revised proposal set forth two alternatives. The first contemplated a purchase price of $6.15 per share with a no-shop provision and a termination fee of 3.75% of the merger consideration. The second alternative

---

[25] Proxy at 60.

contemplated a purchase price of $6.00 per share, a go-shop period, and the same termination fee of 3.75%. Both alternatives included unlimited matching rights for Sequential, information rights and a right to expense reimbursement of $2.5 million in the event MSLO stockholders did not approve the Merger. Neither alternative mentioned the publishing agreement with Meredith. As of the close of trading on June 17, 2015, MSLO's stock was trading at $5.10 per share.[26]

The Special Committee met to consider the revised Sequential proposal on June 19, 2015. At that meeting, the Special Committee was advised that MSLO had received a letter from a third party expressing interest in exploring a possible transaction. The Special Committee determined not to entertain that potential offer and, instead, directed Moelis to request that Sequential increase its bid to $6.65 per share. Moelis made the request but Sequential declined to move from its $6.15 per share offer.

The Special Committee reconvened the next day. At this meeting, the Special Committee was informed for the first time that Stewart had negotiated an agreement whereby Sequential would reimburse Stewart for up to $4 million of the fees she incurred in negotiating her post-closing arrangements. The Special Committee was also informed that Stewart was "not prepared to limit or otherwise alter the

---

[26] Proxy at 4.

[agreement to reimburse fees]."[27]   At this juncture, the Special Committee abandoned its request for $6.65 per share.   Instead, the Special Committee determined to request, and later received, Sequential's agreement to permit MSLO to engage in a thirty-day post-signing go-shop in lieu of a price increase.

The Special Committee met again on June 21, 2015.  At that meeting, Moelis provided a fairness opinion with respect to the Merger at $6.15 per share.  With the fairness opinion in hand, the Special Committee voted unanimously to recommend the Merger to the Board.  The next day, June 22, the full Board approved the Merger. Stewart recused herself from the vote.

### H. The Merger

MSLO and the Sequential Defendants entered into an "Agreement and Plan of Merger" on June 22, 2015.  The Merger Agreement provided for a thirty-day post-signing go-shop period, matching rights for Sequential and a termination fee of $7.8 million during the go-shop period, which would increase to $12.8 million after the go-shop period.  The Merger entitled MSLO stockholders to elect to receive either $6.15 per share in cash or a number of shares of Sequential common stock equal to the $6.15 merger price divided by the volume weighted average price of

---

[27] Compl. ¶ 57 (quoting Proxy at 66).

21

Sequential common stock during the five-day period immediately prior to the Merger's closing.

As had been expressed by Sequential for the first time on May 11 (the day before Stewart began her separate negotiations with Sequential), the Merger Agreement contained a non-waivable condition that the Merger be approved by a vote of at least the majority of the combined voting power of MSLO's outstanding Class A and Class B common stock, as well as a separate vote of at least 50% of the voting power of MSLO's outstanding Class A common stock not owned by Stewart and her affiliates.[28]  MSLO's stockholders approved the Merger on December 2, 2015, with an overwhelming majority of the minority stockholders (99%) voting to approve the deal.  The Merger closed on December 4, 2015.

## I. Stewart's Contractual Relationships With Sequential and MSLO Following the Merger

On June 22, 2015, the date of the Merger Agreement, Stewart entered into two separate agreements with Sequential.  The first was an employment agreement.  The second, a registration rights agreement, was between Sequential, Stewart, Alexis Stewart, the Trust and other related Stewart entities (collectively, the "Stewart Entities").  In addition, Stewart bargained for extensions of two other agreements

---

[28] Proxy at A-58.

she had in place with MSLO. These agreements collectively have been referred to by the parties as Stewart's "side deals."[29]

The relevant provisions of the employment agreement state that Stewart is to serve as "Chief Creative Officer" of the post-merger company for which she will be paid annual compensation of $1.8 million. She will be entitled to a bonus if bonuses are paid to other senior executives. She also will receive 10% of the annual gross licensing revenue earned from the Stewart brand in excess of $46 million. Beginning in 2026, and terminating upon the later of December 31, 2030 or the date of her death, Stewart will receive 3.5% of annual gross licensing revenues for Martha Stewart branded products. Additionally, she will be reimbursed up to $100,000 each year in performance expenses and expenses incurred in providing promotional services.

The employment agreement continues until 2020 and extends automatically for an additional five years if certain gross licensing revenue targets are achieved. Even if the employment agreement is not automatically extended, meaning that the licensing revenue targets are not met, Stewart will become a part-time brand consultant/ambassador for five years and receive annual payments between

---

[29] The theme advanced by Plaintiffs regarding Stewart's side deals with Sequential, of course, is that she had her mind only on her money as revealed by the fact that she bargained for Sequential to pay her more for less work than she had performed for MSLO and, in doing so, diverted consideration away from minority stockholders.

23

$1.5 million and $4.5 million per year. Finally, the employment agreement provides that Sequential will reimburse Stewart up to $4 million in expenses incurred in negotiating her post-merger contractual arrangements.

Pursuant to the registration rights agreement, the Stewart Entities have demand registration rights for all of the shares the Stewart Entities receive in the Merger. Thereafter, the Stewart Entities may include their shares in two offerings of greater than $15 million each and are entitled to certain S-3 registration rights for up to three offerings of greater than $5 million each with piggyback registration rights.

In addition to the new employment and registration rights agreements, the License Agreement was amended and the IP Agreement was amended and restated. The amended License Agreement extends the term of the original License Agreement from 2017 to 2020. Otherwise, the Amended License Agreement tracks the original License Agreement, meaning that Stewart will still receive the same $1.7 million annual payment provided for under the original agreement. The Amended and Restated IP Agreement mostly tracks the original IP Agreement, with one major exception: under the Amended IP Agreement, if Stewart's employment is terminated, she may not use her name in new businesses.

### J. Procedural History

The initial complaint in this consolidated class action was filed on June 25, 2015, three days after the Merger was announced. That action was consolidated with several related actions pursuant to this Court's consolidation order dated August 18, 2015. Plaintiffs filed an amended class action complaint on January 12, 2016, and then a second amended complaint, the operative "Complaint," on July 18, 2016. The Complaint contains two counts: Count I for breach of fiduciary duty against Stewart as MSLO's controlling stockholder and Count II for aiding and abetting breach of fiduciary duties against the Sequential Defendants.

Stewart and the Sequential Defendants filed motions to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6). After initial briefing and oral argument on the motion to dismiss, the Court requested supplemental briefing on June 29, 2017. The supplemental briefing was to address two issues the parties did not fully address in their initial briefing: (1) whether the Court can accept the contents of the Proxy as true at the pleadings stage given the substantial differences between the Complaint and the Proxy with respect to key facts, and (2) whether the framework established by our Supreme Court in *M&F Worldwide* applies to a one-sided controller transaction and, if so, at what point in the process would the "dual procedural protections" of an independent, fully empowered special committee and a majority of the minority vote need to be imposed for purposes of determining

whether both protections were present "*ab initio*."  The parties submitted their supplemental briefing on July 24, 2017.

## II.  ANALYSIS

"The standards governing a motion to dismiss for failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[30]

### A. The Standard of Review: Entire Fairness or Business Judgment Rule?

The Court's consideration of the motions to dismiss must begin with the gating question of what standard of review governs the claims that have been pled against Stewart.  Not surprisingly, Stewart urges the Court to determine that business judgment rule deference is appropriate here for either of two reasons.

*First*, she emphasizes that, although she is indisputably a controlling stockholder, the Merger was an arms-length transaction with a third party.  She highlights that she did not negotiate the Merger—that task was undertaken by a well-

---

[30] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

functioning, fully independent Special Committee. Her alleged side deals with Sequential gave her nothing more than she was already receiving from MSLO. And she received the same consideration for her stock as all other stockholders. According to Stewart, under a long line of precedent, these factors, not countered by the well-pled allegations of the Complaint, justify application of the business judgment rule.[31] In essence, Stewart maintains that, because she did not engage in a conflicted transaction, she should not be held to the onerous entire fairness standard of review.

*Second,* Stewart argues that even if the Court determines the Complaint adequately pleads that she engaged in a conflicted transaction such that entire fairness would be the default standard of review, the Court nevertheless must review the transaction under the business judgment rule because the transaction was accompanied by procedural protections that protected the minority stockholders—a properly-empowered and independent special committee of the Board and a non-waivable condition that the Merger be approved by a majority of the minority stockholders. According to Stewart, under well-established case law, these dual procedural protections have the effect of ratcheting down the standard of review

---

[31] Opening Br. in Supp. of Def. Martha Stewart's Mot. to Dismiss Pls.' Second Am. Class Action Compl. ("Stewart's Opening Br.") 29 (citing, by way of example, *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022 (Del. Ch. 2012)).

from entire fairness to business judgment review even in a conflicted transaction involving a controlling stockholder.[32]

Plaintiffs acknowledge that MSLO was acquired by a third-party not affiliated with the controlling stockholder. They also acknowledge that the controller nominally received the same Merger consideration as the minority stockholders. Nevertheless, they contend that entire fairness review is appropriate here since the controller allegedly diverted consideration to herself at the expense of the minority stockholders in the form of side deals dressed up as an employment agreement and various intellectual property-related agreements. This diversion of consideration was made possible, according to Plaintiffs, because the Special Committee, while at first resistant, ultimately allowed Stewart to negotiate her arrangements with Sequential at the same time the Special Committee was negotiating the Merger price with Sequential. These simultaneous negotiations, in turn, allowed Sequential to determine what it was going have to pay Stewart in the side deals to gain her approval of the transaction before it committed to its best and final offer for the Company. Plaintiffs allege that the effect of this sequencing is evident in the fact

---

[32] Stewart's Opening Br. 37 (citing *In re John Q. Hammons Hotels, Inc. S'holder Litig.*, 2009 WL 3165613 (Del. Ch. Oct. 2, 2009); *Se. Pa. Transp. Auth. v. Volgenau*, 2013 WL 4009193 (Del. Ch.), *aff'd*, 91 A.3d 562 (Del. 2014)).

that Sequential's final offer of $6.15 per share is lower than its initial offer of $6.20 per share.[33]

With these lines drawn, the threshold and dispositive question remains: by what standard of review should Stewart's conduct be measured at this early stage of the litigation? In this case, the question has two parts: (1) whether Plaintiffs have pled facts that allow a reasonable inference that Stewart engaged in a conflicted transaction; and, if so, (2) whether Plaintiffs have pled facts that allow a reasonable inference that the dual procedural protections employed in connection with this

---

[33] Defendants argue that Plaintiffs mischaracterize the sequence of events and how Sequential ultimately arrived at the $6.15 per share offer. They acknowledge that Sequential originally proposed $6.20 per share on April 21, 2015. Compl. ¶ 49. They point out, however, that in early May 2015, Sequential submitted a revised proposal that was conditioned upon MSLO's success in renegotiating the publishing arrangement with Meredith. If the Meredith contract was favorably renegotiated, Sequential would increase its offer to $6.25 per share. If not, the offer would stand at $5.75 per share. Proxy at 60. MSLO was not able to meet the Meredith condition set by Sequential. Against this backdrop, Defendants highlight that the eventual $6.15 per share Merger price, substantially higher than the $5.75 offered by Sequential in early May, was extended on June 5, 2015, *after* Sequential reached agreement in principle with Stewart on her various side deals. Thus, the merger consideration offered by Sequential actually increased after the alleged breaches of fiduciary duty and aiding and abetting had occurred. Given these undisputed facts, Defendants contend that Plaintiffs have not and cannot allege a central element of their claim against Stewart—damages causally related to any wrongdoing by the Defendants. *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006) (stating "the fundamental principle governing entitlement to compensatory damages, which is that the damages must be logically and reasonably related to the harm or injury for which compensation is being awarded"). I address this issue below in connection with my determination of whether Plaintiffs have well-pled that the Merger was a conflicted transaction.

transaction fell short of what is required under Delaware law to justify business judgment review of Plaintiffs' breach of fiduciary duty claim at the pleadings stage.

## 1. Did Stewart Engage in a Conflicted Transaction?

As this court has often reiterated, "entire fairness is not triggered solely because a company has a controlling stockholder."[34] Rather, "the controller also must engage in a conflicted transaction."[35] With that said, "Delaware is more suspicious" when transactions involve controlling stockholders because "[a] controlling stockholder occupies a uniquely advantageous position for extracting differential benefits from the corporation at the expense of minority stockholders."[36] And when a controlling stockholder is involved, there is also "an obvious fear that even putatively independent directors may owe or feel a more-than-wholesome allegiance to the interests of the controller, rather than to the corporation and its public stockholders."[37]

---

[34] *Crimson*, 2014 WL 5449419 at *12 (collecting cases); *see also*, *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016) ("Importantly, the presence of a controlling stockholder does not *per se* trigger entire fairness.").

[35] *Larkin*, 2016 WL 4485447, at *8.

[36] *Id.* at *11 (citing Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J. Corp. L. 673, 678 (2005)).

[37] *Id.*

In the controlling stockholder context, a conflicted transaction typically will fit one of two scenarios. In one scenario, the controller stands on both sides of the transaction, such as when a parent acquires its subsidiary.[38] With regard to these transactions, Delaware law is clear that, absent some basis for burden shifting or burden reduction, the controlling stockholder will "bear the burden of proving its entire fairness."[39] As noted, this scenario does not fit here because Stewart stood only on the sell-side of this transaction and was independent of the buyer.

In the other scenario, the controlling stockholder does not stand on both sides of the transaction but exploits its position of leverage on the sell-side to extract "different consideration or derive some unique benefit from the transaction not shared with the common stockholders."[40] In these circumstances, our courts recognize that even though the controller is not calling the shots on both sides of the negotiating table, it can nonetheless "compete" with the minority by leveraging its controller status to cause the acquiror to divert consideration to the controller that

---

[38] *See, e.g.*, *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014).

[39] *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994).

[40] *Crimson*, 2014 WL 5449419 at *12.

would otherwise be paid into the deal.[41]  Under these circumstances, "entire fairness review will apply *ab initio*."[42]

Among the cases that fit within this latter scenario are cases where the controller actually receives more in merger consideration than the other stockholders[43] and cases where the controller diverts merger consideration from other stockholders by masking the payment as consideration for "side deals."[44] Here, Plaintiffs acknowledge that Stewart received the same $6.15 per share Merger consideration that all other MSLO stockholders received.  Thus, it is clear that the nature and character of Stewart's side deals, as alleged in the Complaint, will drive the analysis of whether Plaintiffs have pled the existence of a conflicted controlling stockholder transaction.[45]

---

[41] *In re John Q. Hammons Hotels, Inc. S'holder Litig.*, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009).

[42] *Larkin*, 2016 WL 4485447, at *8.

[43] *See, e.g.*, *In re Tele-Commc'ns, Inc.*, 2005 WL 3642727 (Del. Ch. Dec. 21, 2005).

[44] *See, e.g.*, *In re LNR Prop. Corp. S'holder Litig.*, 896 A.2d 169 (Del. Ch. 2005).

[45] According to Stewart, in resisting her motion to dismiss, Plaintiffs essentially advocate for a *per se* rule that entire fairness review will apply, regardless of the circumstances, anytime a controlling stockholder negotiates "side deals" with the third-party acquiror.  She cites to *Golaine v. Edwards* for the proposition that this court has rejected the very sort of *per se* rule that Plaintiffs purportedly urge the Court to adopt here.  Although it is not clear to me that Plaintiffs have advanced the *per se* rule that has been ascribed to them, I agree with Stewart that there is no such *per se* rule recognized in our law.  As *Golaine* makes clear, "[t]he analysis of whether [] side transactions tainted the fairness of the transaction to the target stockholders becomes in large measure a judgment about whether it was appropriate or not for those side transactions to occur."  *Golaine v. Edwards*, 1999 WL

Plaintiffs allege that the fact that Stewart's side deals diverted consideration from the minority can readily be gleaned from the trajectory of Sequential's offers. Specifically, according to Plaintiffs, Sequential lowered its offer for the Company after it struck its side deals with Stewart.[46] These allegations, however, cannot be squared with the detailed recounting of the negotiations between the Company and Sequential as set forth in the Proxy.[47] Plaintiffs' "truth" is that Sequential made an initial offer of $6.20 for each share of MSLO stock; the Special Committee then allowed Stewart to negotiate with Sequential on a parallel track to the Special Committee's negotiations with Sequential; and then, after negotiations with Stewart were complete, Sequential *lowered* its offer price to $6.15 per share.[48] Of course, the Complaint not once mentions that Sequential lowered its offer to $5.75 per share after its initial offer of $6.20 per share. The Proxy, upon which Plaintiffs rely, reveals a different truth. There, it is revealed that, in fact, Sequential had already

1271882, at *6 (Del. Ch. Dec. 21, 1999). *See also Houseman v. Sagerman*, 2014 WL 1600724, at *13 (Del. Ch. Apr. 16, 2014) (holding that "[t]o survive a motion for judgment on the pleadings, the plaintiff must plead facts supporting an inference that the side payment represented an *improper* diversion and that, absent the impropriety, the consideration would have gone to the stockholders.") (emphasis in original).

[46] Compl. ¶ 53–54.

[47] As previously explained, I have accepted the statements within the Proxy for their truth because Plaintiffs relied heavily on the Proxy as the source for merger-related facts in the Complaint and it is, therefore, integral to their claims.

[48] Compl. ¶¶ 49–54.

33

lowered its offer for the Company *prior* to the Special Committee giving Stewart permission to negotiate her side deals, and then *increased* its offer after those negotiations were, in essence, concluded.

To review, Sequential's initial expression of interest when it returned to the table in April 2015 was $6.20 per share. After a period of due diligence, on May 11, 2015, Sequential presented the Special Committee with a revised offer comprised of two alternatives—if MSLO successfully renegotiated its publishing agreement with Meredith on more favorable terms, then the offer would be $6.25 per share; if not, then the offer would be $5.75 per share. The Meredith contract was not renegotiated. The next day, May 12, Sequential advised the Special Committee for the first time that Sequential wanted to negotiate with Stewart at the same time it continued negotiations with the Special Committee. After completing separate negotiations with Stewart on the essential terms of her side deals, and even though the contract with Meredith had not been renegotiated on more favorable terms, Sequential increased its offer from $5.75 per share to $6.15 per share. Thus, the facts reveal that after Sequential substantially completed negotiations with Stewart regarding her side deals, its offer for the Company increased by $0.40 per share.

Plaintiffs elected to rest their claim that Stewart engaged in a conflicted transaction on a false narrative—a narrative that strategically omitted, if not outright misstated, a key fact. Sequential did not lower its offer after completing negotiations

34

with Stewart; it increased its offer. With the flaw in their narrative exposed, it is not reasonably conceivable on the pled facts that Stewart caused Sequential to divert consideration from the minority stockholders into its side deals with Stewart.

Putting this dispositive causation issue to the side, Plaintiffs have failed to plead non-conclusory facts that the side deals Sequential offered to Stewart provide her with markedly more lucrative post-merger arrangements than she had in place with MSLO before the Merger. As an initial matter, it cannot be ignored that it was Sequential, not Stewart, who insisted upon and initiated the negotiations with Stewart regarding side deals in order to ensure that Martha Stewart would remain meaningfully involved with the Martha Stewart brand Sequential was acquiring. The Special Committee can hardly be faulted for appreciating that any buyer, including Sequential, would need some level of comfort that Stewart would remain committed after the transaction closed before expending resources negotiating a transaction to acquire the Company that bore her name.

Perhaps more to the point, Plaintiffs have failed to distinguish the "new" side deals from the "old" side deals in any meaningful way that would support the inference that Stewart was extracting consideration from Sequential that otherwise would have gone to the MSLO shareholders. The most Plaintiffs can muster in this regard is that Sequential's commitment to reimburse Stewart for up to $4 million in out-of-pocket fees incurred in connection with her negotiations relating to the

35

Merger "equates to $0.07 per share."[49]   This argument, of course, ignores that

Stewart herself owns almost half of the outstanding shares and therefore would have

received approximately half of that amount even if it had been paid to stockholders.

Moreover, Stewart's previous arrangements also contained a similar entitlement to

reimbursement.

Plaintiffs' allegations regarding the side deals also ignore the authority of this

Court that has declined to sustain a breach of fiduciary duty claim unless the plaintiff

can allege facts that support an inference "that the side payment represented an

*improper* diversion" of consideration.[50]   I cannot reasonably conceive of a

circumstance where Plaintiffs could prevail upon the Court as fact-finder that

Stewart's side deals with Sequential, which to reasonable degrees tracked the

---

[49] Pls.' Answering Br. in Opp'n to Defs.' Mots. to Dismiss 10.

[50] *See Houseman*, 2014 WL 1600724, at *13 (to sustain a disparate consideration claim against the controller "the plaintiff must plead facts supporting an inference that the side payment represented an *improper* diversion and that, absent the impropriety, the consideration would have gone to the stockholders.") (emphasis in original); *Golaine*, 1999 WL 1271882, at *9 ("Put differently, there is nothing in the complaint that supports the notion that KKR took anything off the table that would have otherwise gone to all Duracell stockholders; indeed, by its silence on the matter, the complaint suggests that the Exchange Ratio was set before the KKR fee was set"); *In re First Interstate Consol. S'holder Litig.*, 729 A.2d 851, 861–64 (Del. Ch. 1998) (granting a motion to dismiss upon rejecting conclusory allegations that side transactions affected the terms of a merger agreement). *Cf. Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1245–46 (Del. 1999) (finding that controller had attempted to negotiate disparate merger consideration by attempting to secure side deals where the controller would offer nothing of value); *In re LNR Prop. Corp. S'holders Litig.*, 896 A.2d at178 (same).

structure, value and obligations of the side deals she had in place before the Merger, reflect her improper attempt to divert to herself consideration that Sequential would have paid to the stockholders (keeping in mind, of course, that she herself was a stockholder who had by far the largest stake in the Merger consideration).[51] Sequential was acquiring the Martha Stewart brand and, in part, the continued commitment of Martha Stewart's time, energy and talent to keep the brand alive and thriving. It was entirely proper for Sequential to pay, and for Stewart to accept, extra consideration (just as MSLO had paid before the Merger) to secure the immeasurable value of that commitment. Indeed, these fair value side deals ultimately facilitated the Merger and enabled stockholders to realize premium value for their shares.

Giving Plaintiffs the benefit of all reasonable inferences to which they are entitled, they have failed adequately to plead non-conclusory facts that would support a reasonable inference that Stewart secured for herself consideration that otherwise would have been paid to the minority stockholders and that the minority stockholders suffered direct monetary harm as a result.[52] They have failed, therefore, to state a claim that Stewart, as controlling stockholder, engaged in a conflicted

---

[51] *Synthes*, 50 A.3d at 1024 ("[t]he controlling stockholder had more incentive than anyone to maximize the sale price of the company"); *Crimson*, 2014 WL 5449419, at *17 ("Stockholders generally are presumed to have an incentive to seek the highest price for their shares. That inference or presumption is even stronger in the case of large stockholders.").

[52] *See Houseman*, 2014 WL 1600724, at *13; *Golaine*, 1999 WL 1271882, at *6.

transaction. Accordingly, their breach of fiduciary claim against her must be reviewed under the business judgment standard.[53]

Defendants maintain that, even if the Court determined that Stewart's side deals with Sequential justified a pleadings-stage inference that she engaged in a conflicted transaction, the business judgment rule applies nevertheless since the transaction was structured in a manner that allowed impartial decision-makers—both the Special Committee and minority stockholders—to pass on the *bona fides* of the Merger. Plaintiffs disagree. Because Defendants contend that the dual procedural protections that were put in place here provide a separate basis to invoke the business judgment rule, and to grant their motion to dismiss, it is appropriate to take up this issue notwithstanding my determination that Plaintiffs have failed to plead the presence of a conflicted transaction.

### 2. Did the Dual Procedural Protections Employed Here Lower the Standard of Review?

Stewart argues that the Merger was structured in a manner that provided the minority stockholders with the dual procedural protections of an independent, disinterested and properly-empowered special committee and a non-waivable, fully-

---

[53] *Synthes*, 50 A.3d at 1034 (stating "the plaintiffs must plead that [the controller] had a conflicting interest in the Merger in the sense that he derived a personal financial benefit to the exclusion of, and detriment to, the minority stockholders.") (internal citation and quotation marks omitted).

informed and uncoerced vote of a majority of the minority stockholders. According to Stewart, under these circumstances, there is simply no principled basis to conclude that she should be denied the deference of the business judgment rule in connection with this third-party merger when, under the rule stated in *M&F Worldwide*, she would clearly be entitled to business judgment deference if she stood on both sides of the transaction.[54] Indeed, citing *In re John Q. Hammons Hotels Inc. Shareholder Litigation* ("*Hammons*")[55] and *Southeastern Pennsylvania Transportation Authority v. Volgenau* ("*SEPTA*"),[56] she notes this court already has recognized that the standard of review should ratchet down from entire fairness to the business judgment rule when a third-party transaction allegedly involving disparate consideration paid to the controller is coupled with procedural protections that ensure independent decision makers will have the final say.[57]

---

[54] In *M&F Worldwide*, our Supreme Court held that "in controller buyouts, the business judgment rule will be applied *if and only if*: (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and [approval of] a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority." *M&F Worldwide,* 88 A.3d at 645. These protections must be in place *"ab initio." Id.* at 644.

[55] 2009 WL 3165613 (Del. Ch. 2009).

[56] 2013 WL 4009193 (Del. Ch.), *aff'd*, 91 A.3d 562 (Del. 2014).

[57] *Hammons*, 2009 WL 3165613, at *12 (holding that business judgment would be the applicable standard of review "if the transaction were (1) recommended by a disinterested and independent special committee, and (2) approved by stockholders in a non-waivable vote of the majority of all minority stockholders."); *SEPTA*, 2013 WL 4009193, at *11

Neither *Hammons* nor *SEPTA* addressed the question, addressed squarely in *M&F Worldwide*, of whether the parties to the transaction were required to embrace the dual procedural protections as conditions to consummation *ab initio* in order to justify business judgment review on a motion to dismiss.[58] Their silence on this question, in turn, prompts the question: at what point must the parties to a potentially conflicted third-party transaction involving a controlling stockholder agree to the dual procedural protections in order for the controller to earn pleadings-stage business judgment deference? In this case, the timing issue was confounded by the fact that the parties' initial briefing focused on the chronology as set forth in the Complaint where Plaintiffs alleged that Sequential agreed to a majority of the minority condition *after* Sequential initiated its negotiations with Stewart on side

---

(stating "*Hammons* sets forth the procedural protections necessary for a third-party transaction involving a controlling shareholder to qualify for review under the business judgment rule: (1) the transaction must be recommended by a disinterested and independent special committee, (2) which has "sufficient authority and opportunity to bargain on behalf of minority stockholders," including the "ability to hire independent legal and financial advisors[;]" (3) the transaction must be approved by stockholders in a non-waivable majority of the minority vote; and (4) the stockholders must be fully informed and free of any coercion.").

[58] *M&F Worldwide,* 88 A.3d at 644–46 (holding that business judgment review is the standard of review where the merger "is conditioned *ab initio* upon both the approval of an independent, adequately-empowered Special Committee that fulfills its duty of care; and the uncoerced, informed vote of a majority of the minority stockholders" and that "[i]f a plaintiff can plead a reasonably conceivable set of facts showing that any or all of those enumerated conditions did not exist, that complaint would state a claim for relief that would entitle the plaintiff to proceed and conduct discovery.").

deals.[59]  As noted above, the Proxy contradicts this narrative.  Nevertheless, the parties did not address or even acknowledge the contradiction, at least not initially.

In her first pass on this issue, with the chronology as alleged in the Complaint in mind, Stewart took the position that *ab initio* implementation of the dual procedural protections was not required because, contrary to the framework applicable to a two-sided controller transaction, the courts in *Hammons* and *SEPTA* said nothing about the timeframe in which the protections must be implemented.  By her lights, the Court should presume from this silence that *Hammons* and *SEPTA* intended to hold that the dual procedural protections would invoke business judgment deference so long as they were deployed as conditions at some point before the transaction closed.[60]  *M&F Worldwide* was not reconciled or even addressed in her analysis.

---

[59] Compl. ¶ 60.

[60] In Stewart's original briefing, she made no real attempt to justify why the timing of the implementation of procedural protections would be any less important in the one-sided controller context other than to state summarily, in a footnote, that cases involving alleged disparate consideration are governed by the *Hammons* standard.  *See* Stewart's Opening Br. at 37 n.22. ("Plaintiffs challenge that these protections were not present 'at the outset,' but that requirement applies to self-interested transactions between the company and the controller, not to cases involving alleged disparate consideration approved by a special committee of the board.").  At oral argument, when asked to elaborate, counsel for Stewart argued that "a two-sided controller transaction is inherently more suspect than a sale to a third party by a controller."  Oral Arg. Tr. 24.  I address these arguments below.

For their part, Plaintiffs argued that *Hammons* and *SEPTA* offer little, if any, guidance since neither case addressed a controlling stockholder's entitlement to pleadings-stage business judgment deference; both were decided on motions for summary judgment with the benefit of full evidentiary records that reflected the efficacy, or lack thereof, of the procedural protections in place with regard to the specific transactions at issue in those cases. While not citing to *M&F Worldwide* (or the opinion in *In re MFW Shareholders Litigation*[61] which it affirmed), Plaintiffs emphasized in their answering brief that timing mattered and that the Complaint adequately pled that the dual procedural protections were deployed too late since Sequential agreed to the majority of the minority condition only *after* Sequential was well into its negotiations with Stewart over her side deals.

The Court's consideration of the efficacy of the dual procedural protections, including the timing issue, took a turn when it was discovered post-argument that the allegations in the Complaint regarding the timing of Sequential's majority of the minority vote condition did not square with the chronology set forth in the Proxy on which the Complaint so heavily relied. Recall that the Proxy explains that Sequential imposed the majority of the minority condition *before* it approached the Special

---

[61] 67 A.3d 496 (Del. Ch. 2013).

Committee about negotiating directly with Stewart.[62] The parties had not addressed the relevance, if any, of the discrepancy between the Complaint and the Proxy with respect to this timing issue in their initial round of briefing or at argument. Nor had the parties addressed in any detail whether the strict requirements set forth in *M&F Worldwide* even applied in these circumstances. So the Court requested supplemental briefing on these issues. Specifically, the Court inquired (a) whether the detailed road map laid out in *M&F Worldwide* applied in the context of a one-sided controller transaction involving allegations of disparate consideration; and, if so, (b) whether the sales process leading up to the Merger complied with this detailed road map in all respects, including with respect to the timing of the protective measures implemented "as conditions to the procession of the transaction."[63] With the supplemental briefs in hand, I consider these questions in turn below.[64]

### a. The *M&F Worldwide* Framework Applies to One-Sided Controller Transactions

*M&F Worldwide* was the culmination of decades of Delaware jurisprudence that had wrestled with the appropriate standard by which controlling stockholder transactions should be reviewed. There, our Supreme Court affirmed then-

---

[62] Proxy at 60.

[63] *M&F Worldwide,* 88 A.3d at 645.

[64] I appreciate the parties' helpful supplemental submissions in response to these questions.

Chancellor Strine's decision in *In re MFW*, where he synthesized the evolution of our law regarding controlling stockholder transactions and held for the first time that a transaction involving a controlling stockholder standing on both sides of a transaction, under limited circumstances, could be reviewed under the business judgment rule, prior to trial, including *at the pleadings stage*.[65]  Following *M&F Worldwide*, it is now settled in the context of a controlling stockholder squeeze-out merger that if the transaction is structured to follow the detailed road map laid out there, the transaction will be assailable, even at the pleadings stage, only on the basis of waste, a notoriously exacting standard.

As noted, *M&F Worldwide* was careful to emphasize that business judgment review would be triggered "*if and only*" the "procession of the transaction" strictly complied with each element of the road map, including the requirement of *ab initio* timing.[66]  Stewart offers two reasons why *M&F Worldwide* is not controlling here. First, she continues to maintain that *Hammons* and *SEPTA* govern since those cases addressed the one-sided controller, disparate consideration scenario present here. Second, she argues that "a two-sided controller transaction is inherently more suspect than a sale to a third party by a controller."[67]

---

[65] 67 A.3d 496 (Del. Ch. 2013).

[66] *M&F Worldwide,* 88 A.3d at 645.

[67] Oral Arg. Tr. 24.

Plaintiffs' position is that the strict requirements of *M&F Worldwide* do apply in third-party transactions involving controlling stockholders.[68]   They contend, however, that the Complaint and incorporated documents reveal enough at this stage to support a reasonable inference that the dual procedural protections deployed here did not satisfy *M&F Worldwide* and, therefore, were not effective in delivering their intended results—the protection of the minority stockholders.  They also argue that Stewart's arguments in support of her effort to escape the strict requirements of *M&F Worldwide* find no support either in the authority on which she relies or in the bases upon which both the Chancery and Supreme Court decisions in *M&F Worldwide* rest.

In *Hammons* and *SEPTA*, the court determined that the business judgment rule applies where the transaction: "(1) is recommended by a disinterested and independent special committee; (2) which has 'sufficient authority and opportunity to bargain on behalf of minority stockholders,' including the 'ability to hire independent legal and financial advisors'; (3) [is] approved by stockholders in a non-waivable majority of the minority vote; and (4) the stockholders [are] fully informed

---

[68] Letter from Carmella P. Keener to the Honorable Joseph R. Slights, III in Response to the Court's Request During June 29, 2017 Teleconference (Trans. ID 60868536) ("Pls.' Supplemental Br.") at 8 (stating that "[t]he *M&F Worldwide* dual procedural protections in the context of a two-sided controller transaction may operate similarly in one-sided controller transactions.").

and free of any coercion."[69]  Lest there be any doubt as to whether *Hammons* and *SEPTA* reflect "good law," the Supreme Court removed that doubt when it affirmed *SEPTA* by summary Order.[70]

Stewart is correct that both *Hammons* and *SEPTA* involved mergers with third-parties where the target's stockholders alleged that a controlling stockholder was conflicted after negotiating and ultimately securing disparate merger consideration.  She is also correct that in neither case did the court appear to dwell on the timing of the target company's implementation of the dual procedural protections.  Indeed, in both cases, the protections were deployed after negotiations with the third party began but prior to the close of the mergers and yet, in both cases, the courts were satisfied that if the measures were effective, then a shift from entire fairness to business judgment review was justified.[71]  Critically, however, neither case addressed the question that Stewart has called here—whether *pleadings-stage* business judgment deference is appropriate when minority stockholders allege that a controlling stockholder competed with them for merger consideration.  Both cases were decided on motions for summary judgment.  And both were decided without

---

[69] 2013 WL 4009193, at *11 (citing *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *10–11).

[70] *Se. Pa. Transp. Auth. v. Volgenau*, 91 A.3d 562 (Del. 2014) (TABLE).

[71] *Id.* at *2.  *SEPTA*, 2013 WL 4009193, at *1.

46

the guidance of *M&F Worldwide,* where the emphasis on strict compliance, including *ab initio* timing, was first set forth and explained.

This strict or "formalistic"[72] approach to pleadings-stage transactional standard of review determinations in *In re MFW* and *M&F Worldwide* was not at all surprising. Because the court was addressing whether the minority stockholders' claim should be dismissed before discovery, both this court and the Supreme Court took pains to provide a detailed road map of the points of protection the controller must visit to earn business judgment deference on a motion to dismiss.[73] In this light, *Hammons* and *SEPTA* are properly viewed as two of several waypoints on the long road leading to *M&F Worldwide*, not as controlling authority for the determination of when one-sided controlling stockholder transactions involving allegations of disparate consideration will be reviewed at the pleadings stage under the business judgment rule.

---

[72] *In re Sauer-Danfoss, Inc. S'holder Litig.*, C.A. No. 8396-VCL (Del. Ch. Oct. 23, 2013) (TRANSCRIPT) at 79 ("[W]hen the question is what's the standard of review, we have been far more formalistic in our requirements . . . . [W]e've talked about specific, readily ascertainable transactional situations or voting scenarios so that people know where they are.").

[73] *M&F Worldwide*, 88 A.3d at 645. *See also Books-A-Million*, 2016 WL 5874974, at *8 n.2 (describing this dynamic and noting that to achieve business judgment deference defendants must "have described their adherence to the elements identified in *M&F Worldwide* in a public way suitable for judicial notice").

47

I also disagree with Stewart that the risks and incentives differ significantly as between two-sided controller transactions and one-sided controller transactions where the controller is alleged to have competed with the minority for consideration. The risks are obvious; our law is clear that a controller's interests do not align with those of other stockholders when the controller competes with the minority for deal consideration.[74] The conflicts inherent in the disparate consideration scenario are no more or less present or worrisome than in the scenario where the controller stands on both sides of the transaction. Both scenarios justify our corporate law's highest level of scrutiny, entire fairness.[75]

The need to incentivize fiduciaries to act in the best interests of minority stockholders, likewise, is equally important in one-sided and two-sided conflicted controller transactions. In both instances, the key is to ensure that all involved in the transaction, on both sides, appreciate from the outset that the terms of the deal will be negotiated and approved by a special committee free of the controller's influence and that a majority of the minority stockholders will have the final say on whether the deal will go forward. Regardless of which side of the transaction a conflicted

---

[74] *Crimson*, 2014 WL 5449419, at *12–13 (collecting cases).

[75] *Id.* In fact, entire fairness applies to allegedly conflicted transactions where the controller is on only one side of the transaction precisely to "assuage the risk that a controller who stands to earn 'different consideration or some unique benefit' will flex his control to secure that self-interested deal to the detriment of minority stockholders." *Larkin*, 2016 WL 4485447 at * 9 (citing *Synthes*, 50 A.3d at 1033).

controller stands, it is critical that the process is designed from the outset to incentivize the special committee and the controller to take positions at every turn of the negotiations, including during the negotiation of side deals, which will later score the approval of the majority of other stockholders.  Only then is it appropriate to reward the controller with pleadings-stage business judgment rule deference.[76]

Given the looming conflict created by potentially disparate consideration, I can see no principled basis to conclude that it would be somehow less important that Stewart and Sequential be incentivized from the outset of their negotiations to take positions and to reach side deals that will be acceptable to the other stockholders

---

[76] I note that the discussion in *In re MFW* regarding the costs and benefits of providing controlling stockholders with a point-by-point road map to achieve dismissal is equally apt here. *In re MFW*, 67 A.3d at 534–35 (observing that an obvious cost of creating the map is that, if followed, controlling stockholders will avoid judicial review of the substantive fairness of the transactions in which they engaged to the alleged detriment of the minority, while the benefit of offering pleading-stage business judgment deference is that the controller and the target board will be incentivized *at the outset* of the sales process to implement both procedural protections and to ensure that they remain effective throughout the process).  Assuming strict, *ab initio* compliance with the road map, the benefits of avoiding litigation risk and agency costs and, more importantly, the benefits of incentivizing the sell-side constituencies involved in a controlling stockholder transaction to manage conflicts properly at the outset of the process for the protection of the other stockholders will outweigh the risk that minority stockholders will be deprived of judicial review of the transaction.  As this court has recognized, adopting the majority of the minority vote requirement up front has an important effect on the special committee because "most directors will want to procure a deal that their minority stockholders think is a favorable one, and virtually all will not want to suffer the reputational embarrassment of repudiation at the ballot box."  *Id.* at 529.  In other words, "because a special committee knows from the get-go that its work will be subject to disapproval by the minority stockholders, the special committee has a strong incentive to get a deal that will gain their approval."  *Id.* at 530.

49

than it would be if Stewart was negotiating to acquire the Company. The potential

for conflict is omnipresent in both scenarios. Thus, to the extent any doubt remained

following *In re MFW* and *M&F Worldwide*, I am satisfied that strict compliance

with the transactional road map laid out in those seminal decisions is required for

the controlling stockholder to earn pleadings-stage business judgment deference

when it is well-pled that the controller, as seller, engaged in a conflicted transaction

by wrongfully diverting to herself merger consideration that otherwise would have

been paid to all stockholders.

While Stewart has questioned whether strict compliance with the *M&F*

*Worldwide* road map was required with respect to the Merger, she has not shied away

from those requirements when addressing the Court's inquiry as to whether the

"procession of the transaction" followed the road map.[77] In particular, with respect

to the timing issue, she argues that the dual procedural protections must be in place

"before any actual agreement on terms involving separate contracts with the

controller have taken place . . ."[78] Alternatively, she argues that the earliest the Court

should measure whether the *M&F Worldwide* requirements are in place is at the time

the conflict potentially surfaces—in this case, at the time she began her negotiations

---

[77] *M&F Worldwide,* 88 A.3d at 645.

[78] Letter to the Honorable Joseph R. Slights, III from Kevin R. Shannon, Regarding Questions Raised During June 29, 2017 Teleconference (Trans. ID 60886825) at 2; Stewart's Reply Br. 37 n.22.

with Sequential over side deals. Plaintiffs, on the other hand, argue that the dual procedural protections must be in place "at the moment either the controller or the buyer communicates any effort or intention to seek to negotiate or propose separate consideration and arrangements for the controller in the transaction."[79]

In a transaction where the controller is on both sides, such as a squeeze-out merger, the controller has the ability publicly to announce that it is conditioning any transaction on the *M&F Worldwide* procedural protections in its initial offer to the board of the target. Because the controlling stockholder decides when to begin negotiations regarding a transaction and on what terms, the "outset" of the transaction is clear. In the one-sided controlling stockholder context, however, where an unaffiliated third party initiates the process with its offer, the controller obviously has no control over the conditions the third party will impose on the process or approval of the transaction. But the controller can ensure that the third party and the target have agreed to both procedural protections before she begins to negotiate separately with the third party for disparate or non-ratable consideration. That is when the potential conflict with the minority surfaces.

Plaintiffs urge the Court to adopt a rule that would require the procedural protections to be implemented at the outset of discussions between the target and the

---

[79] Pls.' Supplemental Br. at 13.

third party even if the controller and third party have not even hinted that they might engage in separate negotiations. Such a rule would make no sense for the simple reason that the *M&F Worldwide* protections serve no purpose at the outset of discussions between a target and third party when the only proposal from the putative buyer is that all shareholders receive the same price for their shares. No conflict or potential for conflict (assuming *status quo*) exists at this point; the interests of the controlling stockholder and the minority stockholders are aligned.[80]

In my view, the correct time at which to determine if the *M&F Worldwide ab initio* requirement has been met is the point where the controlling stockholder actually sits down with an acquiror to negotiate for additional consideration. If the procedural protections are implemented before that time, then all actors, and most importantly the controlling stockholder, enter those negotiations aware that both the Special Committee and the majority of the minority stockholders will have the final say on whether the deal, with the controller's extra consideration, will be approved. In the parlance of *In re MFW*, the "get-go" of the process in the disparate

---

[80] *See Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 721–22 (Del. 1971) (holding that when the controller "receive[s] nothing [in a transaction]. . . to the exclusion of [the] minority stockholders," the business judgment rule is the proper standard by which to evaluate the board's decision to approve the transaction); *Synthes*, 50 A.3d at 1034 (stating "the plaintiffs must plead that [the controller] had a conflicting interest in the Merger in the sense that he derived a personal financial benefit to the exclusion of, and detriment to, the minority stockholders.") (internal citation and quotation marks omitted).

consideration case is the moment the controller and third party begin to negotiate the controller's side deals.[81]

The question remains whether the process implemented by the Special Committee and Sequential in this case satisfied the *M&F Worldwide* framework. According to Stewart, it is clear from the Complaint that the dual procedural protections were solidified in the transactional structure prior to any alleged conflict surfacing between her and the minority stockholders, *i.e.*, before she commenced discussions with Sequential regarding her side deals. Moreover, according to Stewart, the Complaint has failed to plead any facts that support a reasonable inference that the dual procedural protections were not effective and did not yield their intended results. Specifically, the Complaint and the incorporated Proxy acknowledge that the Merger was negotiated and approved by the properly-constituted Special Committee and was conditioned on the affirmative vote of the majority of the minority stockholders who, when called to vote, overwhelmingly approved the transaction.[82]

---

[81] *In re MFW*, 67 A.3d at 530.

[82] Reply Br. in Supp. of Def. Martha Stewart's Mot. to Dismiss Pls.' Verified Second Am. Class Action Compl. ("Stewart's Reply Br.") 38.

Plaintiffs disagree. They argue that the Complaint adequately alleges that the Special Committee was conflicted and otherwise ineffective.[83] As for the majority of the minority condition, they allege this condition was imposed too late in the process and, therefore, did not comply with the requirement in *M&F Worldwide* that the dual procedural protections exist *ab initio*.[84]

I address the efficacy of the Special Committee first. I then consider whether the majority of the minority condition was imposed *ab initio* and whether it was effective in its implementation.

### b. The Independence and Effectiveness of the Special Committee

Even though they voluntarily dropped all claims against members of the Board, including the Special Committee, Plaintiffs allege that the Special Committee was comprised of directors loyal to Stewart and therefore was not fully independent as required by *M&F Worldwide*.[85] To plead that a director was "interested" in a transaction, a plaintiff "must allege facts supporting a reasonably conceivable

---

[83] The Special Committee was formed well before Sequential arrived on the scene. Plaintiffs do not, therefore, challenge the timing of the implementation of this condition under *M&F Worldwide*.

[84] *Id.* at 644.

[85] *M&F Worldwide*, 88 A.3d at 646 (holding that "the special committee must 'function in a manner which indicates that the controlling stockholder did not dictate the terms of the transaction and that the committee exercised real bargaining power at an arms-length'") (citations omitted).

54

inference that the director received 'a personal financial benefit from a transaction that is not equally shared by the stockholders.'"[86] To plead that a director "lacked independence," a plaintiff "must allege facts supporting a reasonable inference that a director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party so as to undermine the director's ability to judge the matter on its merits."[87] In the controlling stockholder context, a plaintiff "must demonstrate that the director is beholden to the controlling party or so under [the controller's] influence that [the director's] discretion would be sterilized."[88] "Bare allegations that directors are friendly with, travel in the same social circles as, or have past business relationships with the proponent of a transaction . . . are not enough to rebut the presumption of independence."[89]

---

[86] *In re Books-A-Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *9 (Del. Ch. Oct. 10, 2016 (citing *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

[87] *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) (stating that one way to allege successfully that an individual director is under the control of another is by pleading "such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person")), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). aw

 (stating that one way to allege successfully that an individual director is under the control of another is by pleading "such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person")).

[88] *M&F Worldwide*, 88 A.3d at 648–49 (internal quotation marks and citations omitted).

[89] *Id.* at 649 (citing *Beam ex rel. Martha Stewart Living Omnimedia v. Stewart*, 845 A.2d 1040, 1051–52 (Del. 2004)).

Plaintiffs do not allege that the members of the Special Committee were interested in the Merger. They do, however, attempt to state a basis to infer that the Special Committee was not independent because each of its members was somehow beholden to Stewart. I address these allegations in turn.

As to Pierre deVilleméjane, the Chairman of the Special Committee, Plaintiffs allege that he is also the CEO of WWRD, a company that makes products under various brand names, including Wedgwood and Waterford. Wedgwood, in turn, carries a line of products designed by Stewart and sold under the name "Martha Stewart Collection by Wedgwood."[90] Wedgwood and Waterford Products are promoted on MSLO's website. Nothing about this connection even remotely suggests that deVilleméjane lacked independence.

In order to show that a presumptively independent director is nonetheless beholden to a controller, a plaintiff "must satisfy a materiality standard."[91] As our Supreme Court has explained, "[t]he court must conclude that the director in question had ties to the person whose proposal or actions he or she is evaluating that are sufficiently substantial that he or she could not objectively discharge his or her

---

[90] Compl. ¶ 31(c).

[91] *Id.*

56

fiduciary duties."[92] Therefore, "the existence of some financial ties between the interested party and the director, without more, is not disqualifying."[93] Plaintiffs have not even attempted to plead the materiality to deVilleméjane of the relationship between WWRD and Stewart. Consequently, the Court has no grounds to question his independence based on this relationship.

For William Roskin, who was previously employed at Viacom until 2008, Plaintiffs highlight that Viacom and its affiliate carried the *Martha Stewart Living* syndicated television program until 2004. This bare allegation of a prior business relationship from over a decade ago between Stewart and the company for which Roskin used to work is precisely the type of conclusory allegation concerning a prior business relationship that does not come close to overcoming the presumption of independence.[94]

As for Arlen Kantarian, Plaintiffs allege that he previously served as CEO of Professional Tennis for the USTA and US Open from 2000 to 2008. To create a

---

[92] *Id.* (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1167 (Del. 1995) ("[A] shareholder plaintiff [must] show the materiality of a director's self-interest to the . . . director's independence. . .")).

[93] *Id.*

[94] *Beam*, 845 A.2d at 1051–52 (stating that "allegations that Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,' even when coupled with Stewart's 94% voting power, are insufficient, without more, to rebut the presumption of independence.").

connection to Stewart that would cast doubt on Kantarian's independence, the only allegation Plaintiffs serve up is that Stewart shares Kantarian's interest in tennis. In this regard, Plaintiffs allege that Stewart has three tennis courts on her various properties and has previously attended US Open events. To characterize this attempt to undermine Kantarian's independence as a "double fault," while perhaps befitting, would not do justice to the frailty of the argument. Our courts have been crystal clear that such bare allegations of a shared interest, or even that the controller and the director travel in the same social circles, are insufficient to rebut the presumption of independence.[95]

Finally, as for Margaret M. Smyth, Plaintiffs allege that she was previously a partner at Arthur Andersen and that, while there, MSLO was one of her "accounts."[96] Here again, this is nothing more than a bare allegation of a past business relationship that does nothing to call into question Smyth's independence.[97]

In addition to the specific allegations of conflict directed at each member of the Special Committee, Plaintiffs also make a blanket allegation that the Special

---

[95] *Id.; see also M&F Worldwide*, 88 A.3d at 648–49 (same); *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 369 (Del. Ch. 2008) (same).

[96] Compl. ¶ 31(e).

[97] Additionally, I note that any alleged conflict that might call into question Smyth's independence would be wholly irrelevant because Smyth left the Special Committee on November 13, 2014, which was prior to the time negotiations with Sequential began.

Committee was beholden to Stewart because her voting control empowered her to elect each member of the board of directors, including the Special Committee members. Our Supreme Court has made clear, however, that "proof of majority ownership does not strip the [other] directors of the presumptions of independence."[98] In considering whether demand on the board was excused in the derivative suit context, this court has held that the controller's ability to remove or replace directors does not, by itself, demonstrate a capacity to control them absent "allegations that remaining on [the] board is material to the outside directors…"[99] Materiality, in this context, is measured by whether the plaintiff has alleged specific facts that support a reasonable inference the board members "would be incapable of" acting independently on a particular proposal because the controller's ability to remove them had "an inappropriate effect on their decision making process."[100]

With this materiality standard in mind, I have no hesitation in concluding that Plaintiffs have failed adequately to plead that the members of the Special Committee lacked independence due to a material interest in remaining on the board of MSLO, or that Stewart's control of MSLO affected their decision-making process in any way. Indeed, any suggestion that the Special Committee members had a material

---

[98] *Aronson*, 473 A.2d at 815.

[99] *Beam ex rel. Martha Stewart Living Omnimedia*, 833 A.2d at 978.

[100] *Id.*

interest in remaining on the MSLO board—a fact Plaintiffs do not even summarily allege—is belied by the fact that none of them made any effort to remain affiliated with Sequential or TopCo at any time during the negotiations of the Merger or after.

Plaintiffs also attempt to challenge the Special Committee's effectiveness. As an initial matter, they challenge the mandate of the Special Committee. In this regard, they contend that the Special Committee was initially only authorized to hire legal and financial advisors and therefore did not have the broad mandate required under Delaware law until sometime later in the process.[101] Once again, however, Plaintiffs' allegations in the Complaint do not match up to an objective reading of the Proxy.[102] More to the point, Plaintiffs cannot point to anything that would imply that the Special Committee's broad mandate to negotiate a transaction, and say "no" if it chose, was not well in place by the time it began its discussions with Sequential. This is all that matters when assessing whether the Special Committee's mandate met Delaware standards when it negotiated the Merger at issue here.[103]

---

[101] *See, e.g.*, *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1221–22 (Del. 2012) (describing a special committee with a narrow, and therefore ineffective, mandate as one that could only "evaluate a transaction suggested by a majority stockholder" and "authorized the Special Committee to retain legal and financial advisors" but did not have "express power to negotiate, nor . . . to explore other strategic alternatives").

[102] Proxy at 53 (discussing how the Special Committee received its broad mandate from the Board on the day it was formed).

[103] *See In re Books-A-Million*, 2016 WL 5874974, at *3–4. In *Books-A-Million*, Vice Chancellor Laster, in granting a motion to dismiss under the *M&F Worldwide* framework, noted that the board formed a special committee, authorized the committee to

Plaintiffs' other attempts to undercut the effectiveness of the Special Committee fare no better. In their brief, Plaintiffs adopt a laundry list of allegations they believe demonstrate that the Special Committee did not adequately protect the interests of the minority stockholders.[104] Under the *M&F Worldwide* framework, a

retain legal and financial advisors, and expected the members of the committee to hire their own legal counsel, who would help craft the committee's mandate that would then be approved by the full Board. *Id.* The committee was formed and authorized to hire advisors on January 30, 2015, but did not have its mandate approved by the full board until February 24, 2015. *Id.* This was before negotiations between the controller and the committee had begun. *Id.* The clear lesson from these facts is that the Board need not grant the special committee the authority to hire advisors and establish the committee's broad mandate at the same time in order to brand the committee "effective" under *M&F Worldwide*.

[104] Plaintiffs argue that the Complaint alleges the Special Committee retained legal and financial advisors who were conflicted and who, in fact, controlled the negotiations, permitted Stewart to dictate a "targeted search" for a buyer rather than an auction, permitted Stewart to meet initially with Sequential to discuss the merits of a deal before commencing negotiations on its own, permitted Stewart to negotiate her agreements with Sequential while deferring any discussion of price for the Company, declined even to entertain a third party offer for MSLO after Stewart had completed negotiations on her arrangements with Sequential and, upon finally learning of Stewart's costly arrangements at the eleventh hour, deferred to Stewart's position that she was not going to alter such arrangements. Of these, the allegation Plaintiffs have pressed hardest is that the Special Committee allowed a conflicted financial advisor, Moelis, to negotiate on behalf of the Company. Compl. ¶¶ 41–42. The two conflicts alleged by Plaintiffs are: (1) that a MSLO director and its CEO, a loyal friend of Stewart's, worked alongside a managing director of Moelis, Mark Henkels, at CIBC World Markets and (2) that Moelis has performed services for The Carlyle Group LP, Sequential's second largest stockholder. These alleged conflicts are not material conflicts as a matter of law. As to the first alleged conflict, a relationship between a financial advisor and a member of the Board of the company it is advising would generally raise no concerns of conflict. Plaintiffs attempt to create the conflict by arguing that this specific director was not just any member of the Board, but was a Stewart loyalist. Even if this daisy chain of inferences could possibly be enough to plead a material conflict of interest, Plaintiffs ignore that Moelis was hired to advise the Special Committee, not the full Board of MSLO. Dienst, the director and CEO who was allegedly loyal to Stewart, was not a member of the Special Committee and the Complaint makes no allegation that

special committee must "meet its duty of care in negotiating a fair price."[105]  To do so, the directors must "inform themselves, prior to making a business decision, of all material information reasonably available to them."[106]  As this court recently explained, "[f]or purposes of applying the *M&F Worldwide* framework on a motion to dismiss, the standard of review for measuring compliance with the duty of care is whether the complaint has alleged facts supporting a reasonably conceivable inference that the directors were grossly negligent."[107]

---

Dienst somehow interfered with the Special Committee's work.  As to the second alleged conflict, this court has previously held, in a variety of circumstances, that a financial advisor's prior dealings with a counterparty to a transaction, standing alone, will not be adequate to plead a conflict of interest.  *See, e.g.*, *In re Inergy LP*, 2010 WL 4273197, at *14 (Del. Ch. Oct. 29, 2010) (holding that financial advisor's "prior dealings" with counterparty to the proposed transaction "d[id] not show that [the transaction committee's] decision to retain [that advisor] . . . was unreasonable").  In this instance, Plaintiffs are not even alleging that Moelis did work for Sequential directly, but only for a Sequential-related affiliate that is the second largest stockholder of Sequential.  This remote relationship, fully disclosed to MSLO stockholders, does not call into question Moelis' independence or the decision of the Special Committee to retain Moelis.  *See* Proxy at 123 (disclosing that "Moelis had acted as financial advisor . . . [to] an affiliate of the Carlyle Group LP, a stockholder of Sequential, in a matter unrelated to the merger agreement . . . and Moelis received customary compensation.").

[105] *M&F Worldwide*, 88 A.3d at 645.

[106] *Aronson*, 473 A.2d at 812.

[107] *Books-A-Million*, 2016 WL 5874974, at *17.

Plaintiffs' vague criticisms of the Special Committee's process and decision-making land far wide of the mark set by *M&F Worldwide*.[108]  As former Chancellor Chandler explained in *In re Walt Disney Co. Derivative Litigation*, "[i]n the duty of care context with respect to corporate fiduciaries, gross negligence has been defined as a reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[109]  Plaintiffs' conclusory allegations do not come close to meeting this high standard.  Instead, the Complaint does nothing more than question the business judgment of the independent committee members, an avenue of attack this court has repeatedly rejected.[110]

---

[108] *M&F Worldwide,* 88 A.3d at 644 (noting that pleadings-stage business judgment deference not available if complaint raises a reasonable inference that the special committee did "fulfill its duty of care").

[109] 907  A.2d 693, 750 (Del. Ch. 2005) (internal citation and quotation marks omitted); *see also Guttman v. Huang*, 823 A.2d 492, 507 n.39 (Del Ch. 2003) (stating that the plaintiff needs to articulate "facts that suggest a *wide* disparity between the process the directors used . . . and that which would have been rational.") (emphasis in original).

[110] *In re MFW*, 67 A.3d at 516 ("[T]he plaintiffs make a number of arguments in which they question the business judgment of the special committee, in terms of issues such as whether the special committee could have extracted another higher bid from MacAndrews & Forbes if it had said no to the $25 per share offer, and whether the special committee was too conservative in valuing MFW's future prospects.  These are the sorts of questions that can be asked about any business negotiation, and that are, of course, the core of an appraisal proceeding and relevant when a court has to make a determination itself about the financial fairness of a merger transaction under the entire fairness standard.").

The Proxy explains in some detail that the Special Committee met frequently over a period of several months. It rejected a proposal from Company A when MSLO's financial condition improved and Company A was unwilling to raise its offer price, a rejection that led directly to the negotiations with Sequential. It allowed Stewart to negotiate with Sequential concurrently only after Sequential committed that the deal would be subject to a majority of the minority vote. It negotiated vigorously with Sequential on price and ultimately secured a post-closing go-shop period despite Sequential's initial reluctance to agree to this deal term. And, importantly, it was able to get Sequential to better its final offer even though the troublesome (from Sequential's perspective) publishing agreement with Meredith was never renegotiated and even after Sequential had reached an agreement with Stewart on her post-closing contractual arrangements. These facts do not support a reasonable inference that the Special Committee was grossly negligent in performing its duties.

### c. The Effectiveness of the Majority of the Minority Vote Condition

As discussed above, Plaintiffs' showcase challenge with respect to the majority of the minority condition is that Sequential agreed to the condition too late in the process. Once the discrepancy between the Complaint and the Proxy is resolved, however, and it is understood that Sequential did not approach the Special Committee about negotiating separately with Stewart until *after* the non-waivable

majority of the minority condition was in place, Plaintiffs' challenge regarding the timing of the majority of the minority condition crashes on the shoals of reality. The Proxy makes clear that Sequential locked this condition into the deal process the day before any potential conflict between Stewart and the minority surfaced. Accordingly, the majority of the minority condition was in place *ab initio*.[111]

---

[111] For the first time in their supplemental briefing, Plaintiffs raise the argument that the majority of the minority vote condition was ineffective because it was "not non-waivable.'" Remarkably, they have yet again ignored the Proxy which makes clear that Sequential told the Special Committee that the transaction was "conditioned. . . on the approval" of a majority of the minority stockholders. Proxy at 29. *See also* Proxy at 9, 107 (disclosing that the Merger "required" the affirmative vote of the majority of the minority). The Proxy then refers stockholders to the Merger Agreement. Proxy at 74. In turn, the Merger Agreement, appended to the Proxy, clearly states that the majority of the minority vote was non-waivable. Specifically, Article VII of the Merger Agreement, entitled Conditions Precedent, states "[t]he respective obligations of the parties to effect the Mergers shall be subject to the satisfaction, or waiver (*except with respect to Section 7.1(a), which shall not be waivable*) by each of the parties, at or prior to the Closing of the following conditions . . .) (emphasis added). Section 7.1(a), which states the explicitly non-waivable obligations of the parties, imposes the following condition: "[t]he MSLO Stockholder Approval shall have been obtained." Proxy at A-58. The term MSLO Stockholder Approval is defined to include the majority of the minority vote. As this court has said before, "[i]f the defendants have described their adherence to the elements identified in *M&F Worldwide* in a public way suitable for judicial notice . . . then the court will apply the business judgment rule at the motion to dismiss stage unless the plaintiff has pled facts sufficient to call into question the existence of those elements." *Books-A-Million*, 2016 WL 5874974, at *8 (internal citation and quotation marks omitted). Based on the description of the condition in the Proxy and the clear and unequivocal statement in the Merger Agreement that the majority of the minority vote "shall not be waivable," the defendants have described their adherence to this element of *M&F Worldwide* in a public way suitable for judicial notice. The Complaint pleads nothing to call that fact into question or to question the timing of the non-waivable condition. *M&F Worldwide,* 88 A.3d at 645 (noting that it is the plaintiff's burden to "plead a reasonably conceivable set of facts showing that any or all of those enumerated conditions did not exist, [which] would [then] state a claim for relief that would entitle the plaintiff to proceed and conduct discovery.").

Plaintiffs next allege that the vote of the minority stockholders was uninformed. Specifically, they allege that the stockholders were not informed of Moelis' alleged conflict.[112] I disagree for two reasons. First, as I have already determined, the alleged Moelis conflict was no conflict at all.[113] Moreover, even if a conflict existed, Plaintiffs, yet again, have ignored the Proxy, which clearly disclosed the relationship between Moelis and the Sequential stockholder that Plaintiffs allege gives rise to the conflict.[114]

Finally, Plaintiffs complain that the majority of the minority vote was not a robust procedural protection in this instance because non-minority shares affiliated with Stewart were counted in the vote. Specifically, they allege that "the 'minority' shares included shares owned by various MSLO insiders, including Stewart's friend Deinst, Stewart's sister-in-law Margaret Christiansen (employed as a Senior Vice President of MSLO), and all other directors, officers, and employees of the Company."[115] This allegation misfires for lack of specificity. First, Plaintiffs have

---

[112] Compl ¶ 41.

[113] Standing alone, the allegations of the financial advisor's prior dealings with the second largest stockholder of the counterparty to the transaction is not adequate to plead a conflict of interest. *See, e.g.*, *In re Inergy LP*, 2010 WL 4273197, at *14 (holding that financial advisor's "prior dealings" with counterparty to the proposed transaction "d[id] not show that [the transaction committee's] decision to retain [that advisor] . . . was unreasonable").

[114] *See* Proxy at 123.

[115] Compl. ¶ 60.

not attempted to quantify what effect counting the purportedly non-minority shares had on the final vote count. They have not alleged, for instance, that the vote would have failed to achieve 51% approval from the minority had the shares they challenge been excluded. They also have not sufficiently alleged that the shares they wish to exclude are, in fact, "non-minority" shares. The Complaint contains no allegations that support a reasonable inference that the vote of any of the shares Plaintiffs seek to exclude was somehow compromised by Stewart's influence.[116] In the absence of these allegations, it is not reasonably conceivable that Plaintiffs could prove that the majority of the minority vote failed to act as a robust procedural protection due to a failure to exclude non-minority shares.[117]

---

[116] Also, I note that Plaintiffs have failed to allege any coercion of the minority. Lack of coercion of the minority is the required sixth element under *M&F Worldwide*. *M&F Worldwide*, 88 A.3d 639.

[117] As an aside, I note that Plaintiffs might have attempted to challenge the effectiveness of the vote on the ground that a reasonable inference could be drawn that the stockholders did not "bless" Stewart's side deals when they voted to approve the Merger. In the typical two-sided controller transaction, where a majority of the minority is asked to vote in favor of the deal, the choice for the stockholders is simply whether to accept a specific price. In the disparate consideration case, however, the minority stockholders are asked to approve both the merger consideration and, implicitly, a variety of potentially complex contractual arrangements between the controlling stockholder and the third-party, the value of which may be difficult to determine. In other contexts, this court has questioned how much a board can permissibly pack into a stockholder vote when seeking to proffer the vote as reflecting "an independent decision maker's" informed blessing of a transaction. *See, e.g.*, *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *23 (Del. Ch. May 31, 2017) (in the context of *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015), holding that it was reasonably conceivable that a stockholder vote favoring the challenged transactions did not reflect stockholder approval of the merits of the transactions because the stockholders "were confronted with accepting an allegedly tainted transaction in order

*************

Plaintiffs have failed to plead facts "sufficient to call into question the existence of th[e] elements" required by *M&F Worldwide*.[118] Accordingly, business judgment review is appropriate and the transaction can only be challenged on the basis of waste. Plaintiffs have not made a waste claim and, in any case, I cannot reasonably conceive of a scenario where they could meet that high standard given the factual allegations they *have* pled.

## B. Aiding and Abetting

To state a claim for aiding and abetting a breach of fiduciary duty, Plaintiffs must plead "(1) the existence of a fiduciary relationship, (2) a breach of fiduciary duty, (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach."[119] Plaintiffs have failed to state a claim for aiding and abetting because they have failed to plead an underlying breach of fiduciary duty by Stewart.

---

to obtain two larger beneficial transactions"). Plaintiffs did not make this argument, however, and I have not considered it.

[118] *Swomley v. Schlecht*, 2014 WL 4470947, at *20 (Del. Ch. Aug. 27, 2014) (TRANSCRIPT), *aff'd*, 128 A.3d 992 (Del. 2015) (TABLE).

[119] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

## III. CONCLUSION

For the foregoing reasons, the motions to dismiss brought by Stewart and the Sequential Defendants must be **GRANTED**.

**IT IS SO ORDERED.**